Good morning. My name is Kenneth McLean and I'm here on behalf of Larry Newkirk regarding his claim to have a serious lung disease caused by inhalation of diacetyl, a chemical used to provide flavor to artificial butter. Mr. Newkirk is here seeking reversal of the trial court's grant of summary judgment on two grounds. The first, I think, is a rather clear one, which the court spent absolutely no time discussing. But the court's, the Ninth Circuit's, opinions regarding this issue, I think, make it abundantly clear that the case should be reversed, and that's on the issue of differential diagnosis. The court did not consider the differential diagnosis of Dr. Pugh, Dr. Parmet and Dr. Eagleman as being sufficient to establish causation in the case, despite the court's ruling in Claussen, which is a quite striking divergence from your case law. Can you help me understand what you mean by differential diagnosis? Yes. And Claussen provides a wonderful description, Judge, better than I could do, so if I could just read it to you. Differential diagnosis, according to the Ninth Circuit, is a common scientific technique, and federal courts, generally speaking, have recognized that a properly conducted differential diagnosis is admissible under Daubert. You go on. The case law specific to differential diagnosis recognizes that the absence of peer-reviewed studies do not, in and of itself, prevent an expert from ruling in a diagnostic hypothesis that might explain the patient's symptoms. In other words, in a differential diagnosis, and you emphasize this in your recent Premiano case, that a doctor is trained to go through the various possibilities in regard to a patient's disease and rule out those that are not likely and come to the most likely conclusion. And in your case, here's what you say about the value of a differential diagnosis in establishing causation under Daubert. We do not believe that a medical expert must always cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness. The first several victims of a new toxic tort should not be barred from having their day in court simply because the medical literature, which will eventually show the connection between the victim's condition and the toxic substance, has not yet been completed. If a properly qualified medical expert performs a reliable differential diagnosis through which, to a reasonable degree of medical certainty, all other possible causes of the victim's condition can be eliminated, leaving only the toxic substance as the cause, a causation opinion based on that differential diagnosis should be admitted. Did these doctors do that? They absolutely did do that. Dr. Pugh, who diagnosed the very workers who manufactured the butter flavor that Mr. Newkirk bought, consumed, ate, and was exposed to, used the same rigorous diagnostic techniques that he did for those workers to diagnose Mr. Newkirk. Dr. Parmet, who is credited with discovering this disease process in microwave popcorn workers, was awarded the Physician of the Year by the American College of Occupational and Environmental Physicians last year because of his work in this area. Like the Jonas Salk of bronchiolitis obliterans and diacetyl exposure, examined and diagnosed Mr. Newkirk using a differential diagnosis. Dr. David Eagleman, who we'll talk about in a second, also examined Mr. Newkirk. A professor at Brown University, an occupational physician, who's written two peer-reviewed articles on this issue and published about it, did a very comprehensive and written differential diagnosis. She ignores all that. Despite your clear direction to her, amplified in 2010 in Premiano that that was appropriate. And essentially what the court says in Premiano is that these are two different regimes we're looking at. A pure science regime where we do a general causation analysis and a specific causation analysis and a differential diagnosis regime, which doctors employ, which is different from that. And what you say in Premiano is this, that the practice of medicine is both art and science. In that a doctor is called upon to use his judgment or her judgment in regard to these issues while sifting through the evidence in regard to an individual patient. And you credit the development of differential diagnosis through the centuries as being inherently reliable. The court ignores all that and conflates a specific general causation, specific causation, pure science analysis with a differential diagnosis. We think that on that basis alone, at the very least, this case must go back with direction that the court must consider the differential diagnoses in light of Claussen and in keeping with Claussen in light of Premiano. That's the first point. Please go ahead. Are you arguing that the district court erred in first requiring a general causation showing? What we're suggesting is that the differential diagnosis is a general causation showing. That is to say, there are two tracks by which a plaintiff can show general causation. Differential diagnosis or a general causation analysis, then applying the specific causation to the individual. Either one suffices under Daubert. Are you saying that Claussen supports your argument that a differential diagnosis is the same as a scientific showing of general causation? Yes, and that's exactly what it holds. It says the case law specific to differential diagnosis recognizes that the absence of peer-reviewed studies does not, in itself, prevent an expert from ruling in diagnostic hypothesis that might explain the patient's symptoms. But you say that the requirement of a showing of general causation is eliminated. But if you read it, no, what it's saying is that it is a showing of causation under Daubert. And if you read the quote that I gave you a minute ago, if a properly qualified medical expert performs a reliable differential diagnosis through which, to a reasonable degree of medical certainty, all possible causes of the victim's condition can be eliminated, leaving only the toxic substance as the cause, a causation opinion based on that differential diagnosis should be admitted. That's a specific causation determination. That's right. But first there has to be a showing of general causation, that this particular substance generally will cause the disease. Well, if you read Clawson, Your Honor, if you read Clawson, there was no such evidence in the case. There were no peer-reviewed studies that showed that the oil in the Coos Bay would cause lesions in the shellfish. None. Zero. According to the court's opinion. The expert simply applied their experience that there was no other explanation that was reasonable. Now, there was contrary evidence, which the other expert drew the conclusion on. But the court is saying in this type of case, which is a novel, new toxic tort, you don't have to wait for public studies. But in this case, we do have. And I'd like to turn my attention to that. Let me just ask you this. The standard of review is abuse of discretion. Correct. So the district court judge has wide latitude in determining what level of scientific evidence must be submitted in order for the court to accept the expert evidence. That's right. So why was it an abuse of discretion for the district court judge to make that determination? He could have gone either way. And either way probably would have been within his discretion. So why should we say it was an abuse of discretion for the district court to say this level just wasn't high enough? If the court had considered the differential diagnosis, I would agree with you. She didn't. She makes no analysis of it. She doesn't consider it. She believes that you must have a general causation opinion first before you can even have a differential diagnosis. But I thought you said that's an alternative to differential diagnosis. It is. And she chose the alternative of general causation. No, no. She didn't consider the differential diagnosis as being sufficient. She doesn't say the differential diagnosis doesn't suffice. She simply says, I don't consider it because the general causation opinion was not met. And I'm saying there's two tracks, and Claussen lays it out. Now, in regard to the general causation issue, let me make this very clear as well. In terms of general causation, our argument was diacetyl causes lung disease. Diacetyl is released from microwave popcorn bags. Therefore, the general causation was established. That is to say, 20 separate peer-reviewed articles established those facts. The defendants agreed with that basic proposition at the oral argument. This is at page 53-5 of our brief. Strong evidence to suggest diacetyl is the problem, counsel said. There is sufficient evidence from which one can conclude diacetyl in sufficient doses is capable of causing lung disease. There is diacetyl in the microwave popcorn vapors. That's 41-4. The diacetyl in microwave popcorn volatilizes and enters the air as respirable vapor. That's 45-1. And so we all agree that diacetyl, which causes disease, is released from microwave popcorn bags. But isn't there a difference between the amount of diacetyl that's released among factory workers and the person who's microwaving popcorn in his or her kitchen? You put your finger on the precise inquiry that should have been raised and discussed by the court, and yet she ignores that. That's where the case comes down in this case. General causation was established by the facts that I just laid out in Dr. Eagleman's careful Bradford Hill analysis of the cases. As we give you the Milliard case recently by the First Circuit, which discusses that method of analysis as establishing general causation. But he went beyond general causation to specific causation, which she does not address at all in the case, except to criticize his calculations. Here's what bothers me about this case. Well, there's several things that bother me about this case in both directions. What bothers me about your side of the case is that I read the two reports by Dr. Eagleman, and I read the district judge's very careful opinion. It seems pretty clear that Dr. Eagleman has overstated what the studies show, hasn't quite played straight with the data in those studies, and the district judge lays that out very carefully. Do you disagree with what the district judge did on these things? I'm not yet talking about differential diagnosis. Yes. I'm talking about his use of the studies that exist. Yes. I was very surprised by her analysis since we asked for an opportunity for Dr. Eagleman to testify at the hearing, and she denied that opportunity to criticize what he did in the case without a sufficient factual record in that regard. But I don't think that Dr. Eagleman played fast and loose, and let me tell you why. Dr. Eagleman came to his conclusion in regard to Mr. Newkirk by comparing the poppers in the plant, that is the workers who only pop popcorn, that's all they did. And they were sick in two separate studies, and including the ConAgra plant that manufactured this product. What Dr. Eagleman did was qualitatively assess their exposures and concluded they were approximately the same. That's what he did with looking at the data in raw form. Following his first opinion, Dr. Morris, defendant's expert, came forward with a formula by which such exposures could be calculated. And so at the defendant's request, at his deposition, Dr. Eagleman did compute the exposures and supplied a supplemental report, as we were required to do under the rule, regarding those numbers. And that's what I provided the court in regard to this supplement, because we discovered last night that when you photocopy colored copies, they come out black and you can't read them. But if you look at the data regarding Mr. Newkirk and compare Mr. Newkirk's calculated exposure using defendant's methods, he received the same type of exposure that the workers at the ConAgra plant received who were diagnosed as having lung disease. So I think that what he did was a very careful analysis. He's been a professor at Brown University for 25 years, teaching in the medical school. It was a very scholarly approach following the Bradford Hill method. You know, a scholarly approach, I've read a lot of expert reports over the years. This was a very odd expert report. I mean, it read kind of like a legal brief. It read like he's talking to children. This is bad. This is good. I mean, he reads to me in terms of just the tone of the report like a crusader. He does not read to me like a neutral doctor acting as an expert. Now, that may be a question of tone rather than use of data. But I have to say it was an odd form of expert report. Dr. Eagleman is a teacher who teaches students. Maybe he was trying to provide it as he would his students in that regard. I haven't examined it for that purpose. But I do know that. But he obviously knows this is not teaching students. He obviously knows this is an expert report. And if I'm a medical student and my doctor instructor says, this is bad, this is good, I ask my doctor teacher, what kind of a kindergartner do you think I am? Well, one of the issues that he does discuss is preventing occupational diseases and has written books on this issue including warnings and what corporations could do to prevent such illnesses. And so to the extent that his tone is unique as the court, it may be attributable to that. But I do know that as the court recognizes, and the court does not take issue with his credentials or his expertise and credits that in the first part of her opinion. So that's all I can say. Now, I'm left with 18 seconds to respond, but I'm happy to answer any other questions. Oh, it turns out you owe us 23, now 24 seconds. This is an important case with some real issues. We'll hear from the other side, and we will give you a chance to respond. Thank you so much. Good morning. May it please the court. I am Corey Gordon. I represent ConAgra. Judge Peterson. Are you going to split your argument? I know you got two different briefs. Yes, I am, Your Honor. How are you going to do it? Half and half? No, I'm going to take the lion's share. What's that mean? Ten to 12 minutes. Okay. And he brought his broom so he can mop up. Okay. Judge Peterson's careful, thoughtful, 71-page opinion, I think, is a textbook of how a trial court should go about methodically, dispassionately reviewing the evidence and applying the principles of Daubert and the teachings of the Supreme Court and the circuit in analyzing. No surprise you agree with her. Absolutely. What do you make of the argument, though, that she really does not, and I think this is probably correct, pay much attention to this what the adversary calls the alternative route of differential diagnosis. Her time is spent analyzing Dr. Eagleman's use of the existing studies, the data, and so on. Dr. Eagleman and the other doctors say in their reports, in addition to their use of the studies, they say, well here are the known causes for this kind of lung disease transplant that are now a whole long list. And they all say any of these other causes, they simply don't exist on the data with respect to this patient. Dr. Eagleman does this, the other doctors do this. The district judge didn't pay much attention to that. What's your response? I think it all goes back to Clausen, and I read Clausen quite differently than appellants do, and I suspect the Court has read Clausen. Clausen doesn't stand for the proposition that any time a qualified expert says, I'm doing a differential diagnosis and I've ruled out every other cause, therefore it's whatever cause I pick out of thin air. Clausen very specifically says the first step in the diagnostic process is to compile a comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration. The issue at this point in the process is which of the competing causes are generally capable of causing the patient's symptoms or mortality. But didn't you agree, didn't your client agree that diacetyl does cause this disease? And I want to address that point. The issue that I was quoted out of context there was whether there is sufficient scientific support for the notion that workers exposed to concentrated vapors from slurry mixtures of butter flavorings, if that can cause disease. And we agreed that both, that the science is there to support the notion that what comes off of a slurry vat at 120 to 140 degrees Fahrenheit is, which does contain disproportionately diacetyl relative to everything else. If you saw a chart of the chemicals, what comes off of a slurry vapor, diacetyl is up here, everything else is down here. What comes out of a bag of popcorn is qualitatively different. It contains diacetyl, yes, but it might have a bump of diacetyl, but then you've got other spice and many other chemicals. So it's a very qualitatively different environment and milieu. But a policy council noted that there were tests that were conducted of workers who did nothing other than pop popcorn. And that's not true. That is simply a misrepresentation. Aren't those the quality control workers? I mean, that's all they do. Well, let me see if I can quickly explain the quality assurance or quality control worker situation. First of all, there are a lot of references to the first plant, the Sentinel plant, the Jasper plant. All of those things involve a plant that's not ConAgra, a product that's not ConAgra. And I don't know that that is terribly clear, but that's the first plant that NIOSH went into. And NIOSH noted that five of the six quality assurance workers there had evidence of obstructive lung disease. NIOSH did not conclude, nor would it have been proper for NIOSH to conclude, in a health hazard evaluation report, that those workers' lung problems were caused by popping that particular brand of popcorn. Now, did that particular brand of popcorn have this artificial butter flavoring with the same chemical, diacetyl? Yeah. This is not in the record, Your Honor, but it did, but much, much higher concentrations of diacetyl. But more importantly, and this is in the record, those Jasper workers, again, they're not ConAgra workers, they were not exposed exclusively to what was coming out of a bag of popcorn. Now, in some ways I'm frustrated by this case because in some ways you're talking past each other. It seems just indisputable that at some concentration and duration of exposure to diacetyl, it is a defensible scientific conclusion that it causes this disease. I don't say it happened. I say it's a defensible scientific conclusion that at some concentration and at some duration, diacetyl exposure causes this lung disease. The question here is, was there enough exposure over a sustained period at a high enough concentration for it to have happened to be the causative factor in this case? And is that a defensible scientific conclusion? I mean, that's the issue. In a sense, it's a very hard issue to resolve, but it's a very easy issue to state, and you don't quite want to come to grips with that. Shouldn't the jury decide that? No. The judge has properly exercised her gatekeeping role. And let me, if I might briefly explain, if you look purely at the chemical diacetyl, which, by the way, is a natural chemical. It occurs in butter, coffee, yogurt, beer, wine. We are all exposed to it continuously throughout the day. Diacetyl is not... I don't sniff yogurt. I don't, you know... The problem that we have here is that it is in the air and it's being breathed. For you to say that it's in yogurt doesn't tell me much, except that it's in yogurt and I eat yogurt. But that's where the issue of dose response becomes important, because if you have no idea what the dose is... No, I'm not talking about dose response. I'm talking about manner of exposure. Manner of exposure. Again, to go back to the qualitative differences? These people in the plants are breathing it. Right. Mr. Newkirk is breathing it. Well, the question is what is it. I'm sorry, Your Honor. Well, the question is not what is it. The question is diacetyl. And you're wanting to say, well, diacetyl in different combinations and in different concentrations is harmless. I think it's a defensible scientific conclusion to say that the fact that it might be in a smaller concentration, it might be combined with something else, it's a perfectly legitimate scientific conclusion based on what we have in front of us that that does not matter. I'm not saying that it's true, but I'm saying it's a perfectly sensible scientific conclusion that that is a sufficiently probable proposition. If I might just go back to the qualitative difference, when a worker is breathing slurry vapors, the overwhelming chemical they are breathing is diacetyl. Everything else is background noise. So to the extent diacetyl is the culprit, whatever dose they're getting, they're getting mostly diacetyl. What comes out of a bag of popcorn, for every molecule of diacetyl that comes out, more molecules of butyric acid and acetic acid come out. Okay, you keep making this point. I'm trying to figure out where you're going with this point. Are you saying that these other compounds are causing the disease? Are you saying that these other compounds neutralize the effect of diacetyl? What are you saying? First of all, it affects the dose, because if you were to breathe a significant dose of diacetyl from microwave popcorn, you'd be breathing in enough butyric acid or acetic acid that it would kill you. That's not responsive to my question. Well, I'm sorry. And the other part of it is, no, not that they are themselves causal agents, but the only science that has examined the issue of the interactions among any compounds was a rat study, and that's in the record. It's the Morris and Hubs study. It demonstrated that there was a modulating effect between diacetyl and butyric acid. In other words, whatever impact diacetyl alone had on the animals, the rodent studies, if you added butyric acid in a very small concentration, it had a significant impact on the absorption of diacetyl. Am I making a mistake, or do I recollect improperly that you have argued that these rat studies are not relevant for causation in humans? They're relevant in the sense that they're, as many animal studies are, they show additional support, and they do provide additional support. But as I read your briefing, you're trying to say, don't pay any attention to these animal studies because these are animals and not people. It's not a question, don't pay attention to them, but none of them studied microwave popcorn vapors. The closest anything came to that. No, but what I'm after is saying, sauce for the goose, sauce for the gander. Either you like the studies, you either allow animal studies in for what they're worth, or you don't allow them in for what they're worth. They shouldn't be excluded. They're certainly part of the scientific milieu. I would suggest that when this court decided the Morin case, and I can give the site in a moment, that was really a very comparable case. In that case, the compounded issue was jet fuel, and the expert in that case said, well, jet fuel contains benzene, and it's very similar to kerosene and diesel. And therefore, the expert relying on kerosene and diesel, studies involving kerosene and diesel, said it's all the same thing. And this court, well, the trial court said, you know, you just haven't explained other than your ipsedixit how jet fuel equals kerosene and diesel. And without that explanation, there's an analytical gap. And that's exactly what Judge Peterson did. Dr. Eagleman said microwave popcorn vapors contain diacetyl, so does the slurry vapors, and so it's the same thing. And he doesn't explain why it's the same thing when they're not chemically the same thing, even though they both contain diacetyl. Let me ask you another question. It's the question I asked at the beginning. Assuming that we have two permissible routes into showing causation by an expert, one of them is based on existing studies, and the other one is in the absence of studies, partly because it's a new phenomenon, we can have a differential diagnosis, we have a number of possible causes of the disease, we eliminate all of those that don't apply because of the history of the patient, and we're left with this as the most probable, even though the scientific studies showing causation don't necessarily tell us, this is the only conclusion we're left with, that is to say, so the differential diagnosis, I think it's fair to say, as your adversary did, that the district judge didn't pay much attention to that. What is wrong with the differential diagnosis given study or analysis given by the experts? Because I read them saying, well, here are the various causes for this kind of obstructive lung disease, and I tick off every one of them with this patient's history, none of them apply. First of all, those aren't an exclusive list of causes. What additional that they didn't consider? Well, the one that the court specifically identified was gastroesophageal GERD, gastroesophageal reflux disease.  Yes, he does. That is in the record. He has a rather lengthy history of GERD, and the court was, Judge Peterson was quite, you know, that was another analytical gap. He has GERD. Dr. Eagleman says the GERD didn't contribute anything to it, and doesn't give any reason why. Maybe it did, maybe it didn't. I guess I need to go back into the record. GERD, I mean, the common name for it is heartburn. Anytime you have acid reflux, you have GERD. The question is whether it rises to the level of causative end disease. How much do we know he had this acid reflux? We know he had it. We know he was treated for it. We know he had a scope that demonstrated that there was esophageal damage as a result of the chronicity of the acid reflux. I mean, it was not an occasional passing heartburn. He has a serious problem with GERD. And does the district judge analyze that? Only as pointing out yet another analytical gap between Dr. Eagleman's conclusion that it had to have been the microwave popcorn and nothing else by pointing out that he blows off a study that connects GERD to bronchiolitis obliterans by saying, ah, no, it didn't have anything to do with it. This is a little bit unfair to you to ask you on the spur of the moment. There's so much stuff in here, and I've read so much of it, I can't put my hands on where Judge Peterson mentioned GERD. Could you tell me? It's towards the end. I can probably find it pretty quickly. Okay. Take as much time as you need. We're not going to shortchange you on time here. I had it open to that page, page 46 of the opinion. Another example of internal contradiction is Dr. Eagleman's treatment of GERD and bronchiolitis obliterans syndrome. He states that the only study that has been released on the subject was published after his first expert report and stated that prospective studies are now required to investigate a causal association between GERD and the development of BOS. Despite that quotation from the only published study, Dr. Eagleman states acid reflux did not cause BO to occur earlier than it otherwise would have. Dr. Eagleman provides no basis for his confidence in making a conclusion that the author's explicitly stated was premature without additional data. Is there anywhere in the district court, I do remember this, is there any place in the district court's opinion where she discusses Mr. Newkirk's history of GERD? I don't know that she specifically references it, other than she references his own treating physicians who did not agree with, I'm sorry, at page seven she references Dr. Agarwal, his treating pulmonologist, who diagnosed him with obstructive lung disease with a significant history of smoking, and elsewhere she cites another treating doctor, and it's in those underlying medical records that GERD is actually discussed. I don't believe she expressly talks about the fact that he has a history of GERD. She was simply pointing that out as yet another analytical gap, that if it had been explained, whether she agreed with the conclusion or not, she would have let it go to the, you know, then it would become an issue for the jury. But without the explanation, it becomes the ifs or dixits. Are there any other causes that you contend, besides GERD, that could have caused it? The main cause, other than lung transplantation, is idiopathic. BO, although a rare disease, has been around for many centuries, long before there was microwave popcorn. And if you didn't have a lung transplant and you ruled out the relatively recently known causes, you'd still have a whole category of cases that aren't known. One of them, and this is significant. And when you say idiopathic, what do you mean by when you say idiopathic? That the cause is unknown, the cause is undetermined. But one of them, and this wasn't even mentioned by Dr. Eagleman, and it wasn't addressed by the court either, but it's called silo fillers disease. And this is of great significance because particularly the Jasper popcorn plant is located in a very rural area. And the NIOSH report itself talks about, I believe it's 63% of the workers in the plant also had potential non-occupational exposures on their farms to chemicals, to the dust that accumulates in silos, which is a known cause of bronchiolitis obliterans. And that issue wasn't even addressed. Well, actually Dr. Agarwal, or one of Mr. Newkirk's treating physicians, was concerned about his exposure to wood dust, his occupational exposure to wood dust as a possible cause. But the point is, in making a differential diagnosis, you still have to have a basis for ruling it in. And Claussen is very clear on that. In Claussen, both sides agreed that low-dose toxicity exposure to oil was a possible cause. Both sides' experts came up with a list of six possible causes. And are you saying low-dose exposure to this chemical is not possible? Low-dose exposure to pure diacetyl, devil's in the details, what do you mean by low-dose? Every one of us has low-dose exposures to diacetyl. Yeah, I know. It doesn't cause it. But my question is, are you saying low-dose exposure to diacetyl is not a possible cause, that it is impossible that it should have done so, should be the causative agent? I am saying that the amount of diacetyl to which a consumer would be exposed, whether they eat five bags, ten bags, 20 bags a day, yes, is too low to cause disease. You're saying it's impossible. Yes. And your basis for saying it's impossible? Well. Not proven is different from impossible, of course. Well, impossible in the sense that there is no scientific evidence to suggest that it isn't, and there is substantial scientific evidence to suggest the contrary. And those same quality control workers, sauce for the goose, sauce for the gander, every single other plant where NIOSH did an investigation, including ConAgra, where there were many more quality control workers who popped 120 bags a shift, no evidence of increased risk of lung disease. So, counsel, what you're saying is in Claassen, the experts agreed on the potential causes. They did, Your Honor. Of the disease, but here the experts did not agree on the potential causes. Absolutely. The Claassen court said it is worth noting that both experts ruled in so-called contact toxicity, low-level toxic effects of oil as a possible cause of the oyster mortalities in this case. So what you have is two experts going through a list of agreed-upon causes, one saying, I think it's this for this reason, the other saying, I think it's this for this reason, and articulating the reasons. Here we have no other experts in the world except the ones hired by a plaintiff's law firm testifying on behalf of plaintiffs. And that's another important point that this court has made repeatedly ever since the original Daubert, is that an expert hired for purposes of rendering a litigation opinion, there's a level of scrutiny to make sure that the conclusions that they're drawing have some objective science behind them. Of course. But you're not, you agree that diacetyl causes this lung disease, but what you're saying is that the levels of exposure that Mr. Newkirk, the exposure he had were not the same as those in the factory who breathed in higher levels, I mean much, much higher levels of diacetyl. Absolutely. Perhaps if I give an example, maybe I'll be able to make a little bit more sense. If you go into a Clorox factory, there'll be large quantities of liquid chlorine being mixed with other ingredients to create Clorox. If a worker there were not wearing respiratory protection, there'd be a serious problem, because they'd be getting a whopping exposure to chlorine. When you use Clorox at home in your laundry, you're getting an exposure to chlorine, mixed with all the other stuff that is mixed in to make Clorox. Even if you've got six kids under the age of two in diapers and you're doing ten loads of laundry a day, you will never get an exposure to chlorine that even remotely compares to what a worker is getting exposed to. That's what you say is impossible. Yes. And there are other examples of that. Liquid ammonia can cause similar diseases. If you go into a plant where liquid ammonia is being used, workers are wearing respiratory protection. If you spray Windex, you're getting exposed to ammonia. So you're saying it's impossible to duplicate the conditions that are in the factory in a home. That's right. Basically. And to the extent any place does duplicate the conditions qualitatively, it would be a quality control room. And if you look at the quality control rooms in every plant except Jasper, and Jasper was a unique situation, and not ConAgra situation, but the ConAgra plant that was examined by NIOSH, none of the workers, the quality assurance workers, were shown to have an increased risk of any lung disease, whether it was from quality assurance work or the exposure to the other fumes. But that's why there is science to support the notion that what's coming out of a microwave bag is not the same qualitatively and even massive amounts that a quality assurance worker brings in doesn't increase their risk of lung disease. Okay. Thank you. We've taken you well over. Thank you for your argument. And we'll now give the other side a chance to respond. Thank you, Jay. I guess I've got to go. Oh, I'm sorry.  Would you like a couple of minutes? This is not your co-counsel's fault. We kept him there. Why don't we give you three minutes, and if you have more than that to say. This is an important case, and it's a difficult case. I want to make sure everybody gets a chance to say what they need to say. Thank you, and I don't think I even need three minutes. May it please the Court, my name is Chris Angus. I represent Christian Hansen in this case. On the issue of differential diagnosis, the only point I wanted to make here is that the differential diagnosis must be properly performed. That was really the focus of the district court's analysis of the so-called differential diagnoses that the plaintiffs contend were performed by Dr. Pugh, Dr. Parmet, and Dr. Eagleman. She found that all of those opinions suffered from analytical problems that prevented them from falling into the category that we have in Claussen, where the court did find that the differential diagnoses were properly performed. For one thing, and I think the most critical point, is that in Claussen, the two experts on both sides did agree on the issue of differential diagnosis. I'm sorry, did agree on the issue of general causation. Both sides agreed that low levels of oil in Coos Bay was a possible cause of widespread oyster morbidity. We don't have that situation here, and so lacking an agreement on the issue of general causation, you have to look further. And what you have to look further to is what the court in Claussen says we look to, and that is, is there a wide variety of objective, verifiable evidence of an association? There was such evidence, widespread evidence, in the record in the Claussen case. In this case, the district court specifically found an absence of evidence of an association between microwave popcorn vapors in a consumer setting and disease. The district court's opinion lays this out in great detail as she goes through Dr. Eagleman's report, Dr. Parmet's report, Dr. Pugh's report. But just to name a few examples that haven't been mentioned so far, there was no evidence in the record of Mr. Newkirk's exposure to microwave popcorn vapors or diacetyl. Wait a minute, that can't be right. How many bags does he pop per day or how many years? But his exposure to the vapors... Let me ask you a question. Four to six, yes, four to six bags over, I believe it was, 11 years. Per day? Per day. And we know that when opened, a bag of popcorn, when it comes out of the microwave, releases diacetyl? We know it releases diacetyl, but we don't know the amount. Okay, let me stop you right there then. You just said, which is why I interrupted, you said there's no evidence that he was exposed to diacetyl. You have just told me that he's in four to seven bags a day, every day for 11 years, that when you open the bag after it comes out of the microwave, it releases diacetyl. You cannot say there was no exposure. No, and if I said that, I misspoke because... Well, that is what you said, and you can now backtrack if you like. I thought you said the level of exposure. That's correct. Oh, well, then I was mistaken, and I apologize. There is no evidence, and this is what troubled the district court. There was no evidence in the record of the level of exposure that Mr. Newkirk was subjected to. There was no evidence in the record of what the minimum low-dose threshold is, if any. None of the plaintiff's experts were able to produce any of this evidence. There was some attempt to do so by drawing an analogy to another consumer case in Colorado, but the district court carefully analyzed the work that was done in that case and concluded that there, too, there was no evidence of a level of exposure and no evidence of general causation coming from that case. So all of this is very detailed in the district court's opinion, which leads to the conclusion that you don't have the kind of widespread, verifiable, objective support in the record that you did have in the Claussen case, and so the similarity between that case and this case, I think, is not well taken. Okay, thank you. Well, we've taken the other side well over. I think if I add them up, we probably gave them an extra minute. I shouldn't say gave them. We subjected them to maybe an additional eight or nine minutes. Why don't we start with five for you and see what happens? That would be fine. I want to, if I can hold these things in place here. I'll just set this there. Judge, you asked a question about where Judge Peterson talked about GERD, and it's at page 46 of her opinion, and she criticizes Dr. Eagleman for considering and ruling out GERD. So it's not that he didn't consider it. He did. He's the one that raised it. But here's why he ruled it out. In his report, he lays out that he was first diagnosed with lung injury in 2003, and he was diagnosed with GERD in 2007. Under the Hill criteria, cause and effect is determined by temporality. You can't say that GERD is the cause of his lung disease before he ever had it. So that's why Dr. Eagleman ruled it out. So he did consider it and did rule it out. Judge Peterson criticizes him as a throwaway argument at the end of her argument. But I think that there's a rational explanation. But this is why we let doctors make these decisions in most cases, as you've said in Premiano. What about the fact that there's no evidence of the amount of exposure a consumer is subjected to by popping 100 bags of fire, whatever it is. I know it's four to six in this case. I know there's that Mr. Dawson, but, I mean, there were a lot of things missing, weren't there? You know, your opinions are very helpful in guiding us through these issues. If you look at footnote on page nine of Clawson, here's what you say about your previous decisions in Westbury and Heller on this very issue. Even absent hard evidence of the level of exposure to the chemical in question, a medical expert could offer an opinion that the chemical caused plaintiff's illness. Right, can offer the opinion, but that doesn't mean that the court has to accept the opinion. That's the difficulty. And also in Clawson, the experts agreed on the parameters. Well, let's talk about that. Let's talk about that, because you need to read that carefully. I have read it carefully. I was speaking for myself, not for the court. I'm sure you have. I read it very carefully, so I would understand what they were saying. And what they are saying is the same thing that we agree here. At a 50,000 foot level, all experts agree that diacetyl can cause disease. Their experts agree with that. We agree with that. They agreed in this particular case, in that particular case, here are the six possible causes of the injury. And their expert rejected it because the levels were too low. Exactly the position they take here. They considered it and rejected it because the levels were too low, the same thing that Mr. Gordon just argued to you. And so the differential diagnosis included the same issues as theirs does, but they say the levels are too low. And your previous opinions say that disagreements about levels are for the jury to sort out. Now, so where in this record is there agreement among the experts that diacetyl is a potential cause of this illness? Where is that in this record? In the experts that they, that we deposed, say that diacetyl can cause bronchiolitis obliterans. They discard it in regard to him because of levels of exposure. But that's the same position that was taken in Clawson. That's the same position in regard to levels. And your opinions say that disagreements in regard to levels are questions for the jury. And that's the fundamental question here, is what's the proper role of the court? Is it gatekeeping or fact finding? The court makes the factual determination. In this case, the levels are not enough. We suggest that your decisions say that that's not the appropriate role in a Dawbert setting for the trial court. Those are questions for the jury to decide based upon the evidence if, in fact, there is evidence. But we do try to provide some estimates of exposure. And Dr. Eagleman's charts that we've given you do make a calculation based upon the formula of the defendants that would suggest that his exposures were the same as the exposures at the ConAgra plant. So there was evidence in the record regarding levels of exposure that could be accepted or not. I heard a representation of what's in the studies that says that with the exception of one plant that's not a ConAgra plant, no one who was involved in quality control work developed this disease. Is that an accurate statement? It is not. Look at page 24 of Dr. Eagleman's report. Hang on a second. What ER is that? The ER. I've got it here in front of me. I've got it. It's 210. It's 155 of Dr. Eagleman's report. I've got it. Well, let's see. Okay. His report begins on ER 156. And page 24 refers to the ConAgra. Oh, wait a minute. I'm sorry. Start now. It's 179, Judge. I'm sorry for the confusion. Huh? ER 179. Oh, page 24. I got it. Okay. I'm not with you. Okay. And then at page 24, there's a discussion of the quality assurance workers at the ConAgra plant. Okay. So put my nose in what I need to see. If you look at page once, is it this one? This is 179. That's the record number. And then page 49, Judge. Yeah, okay. Slurry room and QA workers had the highest percentage of workers. QA stands for what? Quality assurance. Those are the poppers. Okay, right. The slurry workers and the QA lab workers had the highest percentage of workers reporting shortness of breath on exertion, 33% of mixers, and 36% of QA workers participating in the survey, wheezing or whistling in chest without a cold, 50% of mixers, 36. That gives you the data from the NIOSH reports, and it takes into account the QA workers at the ConAgra plant. So there was a study done of QA workers at ConAgra, not this other plant. And at Jasper and at Sioux City. If you look at page 47 of his report, this is page 47 of his report where he discusses the Sioux City workers as well, where quality assurance workers were found to have abnormal lung function. So Mr. Gordon doesn't agree with the findings of NIOSH and he says NIOSH is not reliable in that regard, but it is evidence and Dr. Eagleman can rely on it and he can dispute it by saying it's not reliable. I don't know why he says it's not reliable, but he does. In regard to this impossible argument that he makes, that it's impossible to be caused, I think that that's a classical factual issue that must be decided by a jury, not by a judge on this kind of record, and that goes to the quantification issues in the case, and I think that the judge got confused in that regard and we asked the court to send it back to her with some direction in this regard to help sort through what the court has already said is somewhat difficult. Now, would the appropriate response, if we agree with you, to send it back to her to consider the differential diagnosis question? Do you think we should simply say, sorry, it comes in? I mean, how far do you think we can appropriately go if we agree with you? If you agree with me, what we would like is you to send it back for her to consider the differential diagnosis in light of Claussen and in light of your decision in Premiano. You know, I kept looking in your brief for Premiano. I have not read that case. You did not cite that case to us, I think. It's a new case that we read after the fact, and if you'd like me to put it, I have a citation for you here. Yeah. I assume the other side is aware. Are you aware of this case? Yeah. Okay. Yeah, if you'd give us the site, that would be great. Yes, please. The site is 592 Fed 3rd 558, 598 Fed 3rd 558. Okay. And I guess you didn't send us a 28-J letter? We can do that, yes. No, no, you don't need to now. Yes. But we have a procedure where if we come out, in preparing for argument, it often happens sometimes people sort of fudge on the 28-J rule. They see a case that was decided some time ago that they missed, but this is a perfect 28-J. It's a new case. All right. Yeah, but we've got the citation. Okay. To your question, though, in regard to what I think that the general causation issues, that you should reverse that outright and ask the judge to consider specific causation in light of the fact that general causation is undisputedly established in this case. Okay. That would be my preference. Thank you, Your Honor. You think we can do that on an abuse of discretion standard of review? I think that you can send back to her to consider that it is an abuse of discretion to make a factual determination, as opposed to a gatekeeping function in regard to general causation and direct the court to make a finding in regard to specific causation. I think, yes, it's completely within your discretion to do that, your jurisdiction to do that. Okay. Thank you. Thank both sides. A difficult case, as we can tell, good arguments and good briefing on both sides. The case of Newkirk v. ConAgra Foods et al. now submitted for decision.
judges: Gonzalez, Fletcher W. , Rawlinson